Scott A. YOUNKIN, Petitioner,

v.

**BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, STATE REAL ESTATE COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 4, 2001.

Decided May 7, 2001.

---

William P. Carlucci, Williamsport, for petitioner.

Judity Pachter Schulder, Harrisburg, for respondent.

Before FRIEDMAN, Judge, FLAHERTY and MIRARCHI, Senior Judges.

FLAHERTY, Senior Judge.

Scott A. Younkin (Younkin) petitions for a review of the Order of the State Real Estate Commission (Commission), dated July 19, 2000, which adopted the Hearing Examiner's finding that Younkin brokered a sale of real estate without being licensed under the Real Estate Licensing and Registration Act (Act) or within the Act's exception for licensed auctioneers.[1] For the reasons contained herein, we affirm the Commission's Order.

Younkin is a licensed auctioneer under the Auctioneer and Auction Licensing Act.[2] On February 18, 1997, Younkin entered into a written auction agreement to sell the personal and real property of the Estate of Lucille Kelchner. Under the terms of the agreement, the selling price of the real property was subject to the acceptance of the Estate's Executor. This agreement went into effect on the date of execution and continued for 60 days after the auction.

As advertised, the auction began at 9:30 a.m. on May 3, 1997 with the sale of personal property. At approximately 1:00 p.m., bidding for the real property commenced before an audience of about 100 people with less than six persons actually bidding. Following two rounds of bidding, the highest competitive bid received was $52,000. After the high bid of $52,000, Younkin declared the property "no sale" and withdrew it from the auction. Before he opened the second round of bidding, he explained to the other bidders, including the highest bidder, that "it would have to go higher in order to obtain a successful sale that day." He also explained that he would *negotiate* with an auction customer that did step forward at the agreed price, present a down payment and sign the agreement. He further stated that "[t]he auction *concluded* without any further bidding or direct negotiation...." R.R. 125a (emphasis added).

On May 4, 1997, Younkin received a telephone call from Marlene Whaley (Whaley), a person interested in the property who attended the auction, but was not a bidder. On May 5, 1997, Younkin contacted Whaley and arranged to show her the property on May 6, 1997. On the 6th of May, Whaley offered $60,000 for the property and signed a purchase agreement with the Executor. Younkin received a down payment on the property that he deposited into his escrow account. On

---

1. Act of February 19, 1980, P.L. 15, as amended, 63 P.S. §§ 455.101–.902.

2. Act of December 22, 1983, P.L. 327, 63 P.S. §§ 734.1–.34.

May 7, 1997, the highest bidder on the scheduled day of the auction called Younkin to follow up on her bid and became upset when told the property had been sold without Younkin contacting her as he had said he would. Younkin explained it was sold to someone else at a higher price and explained that she had not bought the property at the auction because there was no consideration, no purchase agreement. R.R. 126a. The sale with Whaley closed on May 27, 1997 and Younkin received $2,400, which represented his 4% commission on the sale.

Following the hearing, the Hearing Examiner proposed twenty-three Findings of Fact, including:

12. The auction on May 3, 1997 concluded without a sale of the property.

13. After the property was declared a "no sale" and withdrawn from the auction, Respondent stated to the auction attendees that bidding on the property was recessed but that he and the family would be interested in talking to anyone who was interested in the property.

R.R. 141a. These Findings of Fact permitted the Hearing Examiner to conclude that the *bona fide* auction ended on May 3 and that Younkin's subsequent actions were therefore outside of the auction exception under the license requirements of the Real Estate Licensing and Registration Act. Consequently, it was determined that Younkin violated the Act and should be assessed a civil penalty of $500. The

Commission adopted the Hearing Examiner's Adjudication and Order and this petition for review ensued.

Younkin raises two issues, the first of which is whether the Commission committed an error of law adopting the Hearing Examiner's interpretation of the statutory definition of auction. Younkin also contends that there is "no evidence in the record" to support Findings of Facts 12 and 13. This Court's standard of review in an appeal from an agency adjudication is limited to determining whether constitutional rights were violated, an error of law was committed or whether necessary findings of fact are supported by substantial competent evidence. 2 Pa.C.S. § 704.

Section 301 of the Real Estate Licensing and Registration Act states that, unless a person is exempted, it is unlawful for a person to act as a real estate broker without first being licensed. 63 P.S. § 455.301. Section 304 specifically exempts auctioneers licensed under the Auctioneer and Auction Licensing Act from this requirement "while performing authorized duties at any *bona fide auction.*"[3] *Id.* § 455.304 (emphasis added). The Commission contends these Acts must be read *in pari materia* and, therefore, uses the definition of "auction" or "sale at auction", as defined under the Auctioneer and Auction Licensing Act, to determine whether Younkin's actions were consistent with an auction.[4] We agree that the two licensure statutes should be read *in pari materia* since Section 304 of the Real Estate Li-

---

3. The exclusion refers to The Auctioneers' License Act, Act of September 29, 1961, P.L. 1745, 63 P.S. §§ 701–732, repealed and replaced by the Auctioneer and Auction Licensing Act, Act of December 22, 1983, P.L. 327, 63 P.S. §§ 734.1–.34.

4. "Auction" or "sale at auction" is defined as:

The offer to sell property by an auctioneer or apprentice auctioneer to the members of an audience congregated for the purpose of making bids for the purchase of the property in an effort by the auctioneer or apprentice auctioneer to advance the amount of the bids to obtain the highest or most favorable offer.
63 P.S. § 734.2.

censing and Registration Act explicitly recognizes an overlap between a broker and auctioneer in the profession of selling real estate. *See Rosen v. Bureau of Professional and Occupational Affairs, State Architects Licensure*, 763 A.2d 962, 965 (Pa. Cmwlth.2000).

The Commission relies on a State Board of Auctioneer Examiners' (Board) Adjudication and Order appended to its brief to permit deconstruction of the definition of auction into the three requisite elements:

(1) The auctioneer must offer to sell a property;

(2) Members of an audience must be congregated for the specific purpose of making bids; and

(3) While the audience is congregated, the auctioneer must advance the amount of the bids to obtain the highest or most favorable amount.

Respondent's Brief at 13. The effect of the Commission's deconstruction is the imposition of the "congregation" requirement on making the bids and advancing the bids. However, after close review, the Board's Adjudication and Order contains no *indicia* of support for the Commission's conclusion that the Board's interpretation "recognized the necessity of the three elements." [5]

■ Since the matter *sub judice* "involves the administration of overlapping disciplines," we cannot simply defer to an administrative agency's interpretation of another administrative agency's organic statute or duly promulgated regulations. *Rosen*, 763 A.2d at 968. Absent evidence of the State Board of Auctioneer Examiners interpretation of the definition of "auction", the State Real Estate Commission's interpretation will not be afforded deference.[6]

■ Therefore, we turn to the Rules of Statutory Construction to determine when an auction concludes and subsequent offers are no longer considered bids. We cannot wholly abandon the definition provided by the General Assembly and impose a definition of auction based on common usage or a dictionary. *Cf.* 1 Pa.C.S. § 1903. Rather, when a statutory definition is not explicit, as with the auction congregation requirement, we must ascertain the intention of the General Assembly regarding the term. *See* 1 Pa.C.S. § 1921.

■ Eight score years ago, the Supreme Court of Pennsylvania stated, "in every sort of auction, there are either successive bids for the property, or successive offerings of it at different prices, in a way *to provoke competition.*" [7] *Hibler v. Hoag,*

**5.** To support its proposition, the Commission quotes a portion of the Adjudication and Order. Placed in its proper context, we do not agree that Adjudication and Order supports the Commission's interpretation:

The evidence presented establishes that Respondent engaged in auctioneering. He offered to sell sports cards to persons gathered for the purpose of bidding on the offered property. He solicited bids and requested higher bids. The highest bidders purchased the cards.

*Bureau of Professional and Occupational Affairs v. Russell A. Sclight, Jr., Individually and d/b/a Diamond Sports Cards, Inc.,* File No. 92–64–00056, Dkt. No. 0156–64–95 at 8 (Order

dated January 23, 1996). We also note that Respondent Sclight was neither present for the formal hearing nor represented by counsel. *Id.* at 2.

**6.** We recognize that due deference is afforded to agency interpretations of their own organic statutes. *See Alpha Auto Sales v. Bureau of Professional and Occupational Affairs*, 537 Pa. 353, 357, 644 A.2d 153, 155 (1994); *Maggiano v. Board of Vehicle Manufacturers, Dealers and Salespersons*, 659 A.2d 1071, 1073–74 (Pa.Cmwlth.1995).

**7.** Commenting on the Act of April 2, 1830, P.L. 147, 60 P.S. § 3 (providing that peddlers, hawkers or traveling merchants not sell "by

1 Watts & Serg. 552, 1841 WL 4137, at *2 (1841) (emphasis added). This early characterization clearly identifies *competition* as an essential element of an auction.[8] The General Assembly's continued recognition of the necessity of competition in auctions is found within the Auctioneer and Auction Licensing Act itself. Section 20 of Act provides for the suspension or revocation of an auctioneer's license or imposition of a civil penalty for "knowingly using false bidders, cappers or puffers", 63 P.S. § 734.20(a)(8), all of which impair competition.[9] Therefore, we conclude that it is consistent with the intent of the General Assembly that the definition of "auction" be interpreted to preserve and promote competition.

It is inherent in the concept of competition in bidding that more than one person has the *opportunity* to bid on the property or advance the current bid.[10] Those present at an auction do not have to actually bid on the property for·the event to be competitive. There may be instances where only one person actually bids on the property. To construe such a sale as an auction, however, the bid must be made in the presence of other potential bidders. A bid made outside the presence of other potential bidders, thereby depriving them of the opportunity to advance the bid, is akin to a private sale with the price being *negotiated* between the buyer/buyer's agent and seller/seller's agent.[11]

While we do not agree with the Commission's suggestion that the State Board of Auctioneer Examiners has interpreted the Auctioneer and Auction Licensing Act in a manner that supports the Commission's elemental test for defining an auction, we nonetheless conclude that such a construction is consistent with the legislative intent of the General Assembly. Accordingly, the Commission did not commit an error of law when it concluded that Younkin's actions after May 3rd were not a bona fide auction and therefore he is not exempt from the real estate licensure requirement.

Younkin's remaining issue before this Court is whether Findings of Fact 12 and 13 are supported by substantial evidence. Substantial evidence is defined as

public auction or outcry") *repealed by* the Act of April 28, 1978, P.L. 202.

8. What then is understood by an auction, according to the usages of Pennsylvania? It is a sale by consecutive bidding, intended to reach the highest price of the article by competition for it; and such a sale the legislature certainly had in its view.

 *Hibler*, 1841 WL 4137, at *2.

9. These terms have not been defined by the General Assembly so therefore we refer to their dictionary definitions. *See* 1 Pa.C.S. § 1903. A "capper [is] a decoy or lure for purpose of swindling." *Black's Law Dictionary* 211 (6th ed.1990). A "puffer [is] a person employed by the owner of property which is sold at auction to attend the sale and run up the price by making spurious bids." *Id.* at 1233. Although "false bidders" is not defined by *Black's*, however we find a synonymous definition in "by-bidding." "The practice consists in making fictitious bids for the property, under a secret arrangement with the owner or auctioneer, for the purpose of misleading and stimulating other persons who are bidding in good faith." *Id.* at 162.

10. Competition requires more than one person in this context, however we do not attempt to quantify how many more than one is required.

11. Younkin contends that his actions after May 3rd were "efforts ... to advance the amount of the bids to obtain the highest or most favorable offer." Brief for Petitioner at 11 (quoting, in part, 63 P.S. § 734.2). Assuming, *in arguendo*, that we were to parse this phrase from the statutory definition, there is little, if any, distinction between this action and the duty of a broker to act in the best interests of the owner/seller.

such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Rosen*, 763 A.2d at 964 n. 6. Younkin asserts that "there is no evidence whatsoever in the record to support Finding 12, that '[t]he auction on May 3, 1997 concluded without a sale of the property' or Finding 13 that the Property was 'declared a "no sale" and withdrawn from the auction.' "[12] Petitioner's Brief at 9.

Following our review of the record, we conclude that the Findings are supported by substantial evidence. Specifically, Younkin testified that the auction concluded between 4:00 and 5:00 p.m. on May 3, 1997. N.T. at 51. Although advertisements concerning the auction indicated that bidding for the real property was set for May 3rd, Hearing Ex. C–5, there was nothing to stop Younkin from *properly* recessing the auction at the conclusion of the business day to another time and place made known to the bidders when they could once again "congregate" and continue the competitive bidding. Additionally, in his letter to the Commission dated November 25, 1997, Younkin stated:

> I offered the real estate, and we obtained a high bid of $52,000.00, at which time I adjourned to consult with the family. The family informed me the bid would not be accepted. Therefore, I offered the real estate in a second round of bidding during which the bidding did not advance any further. Upon no further advance in the bidding I declared the property "no sale" and withdrew it from the auction.

Hearing Ex. C–6. R.R. 125a.

The intent of the Legislature in regulating auctions was clearly to create an atmosphere of competitive bidding where the revelation of the amount bid as the purchase price to other bidders present can be relied upon by those present as an opportunity to acquire the property by exceeding a known amount. Here, there is evidence in the record that after the last highest bidder had complied with the rules of bidding and the owner refused the bid. Younkin declared the property no sale and withdrew it from the auction. He then attempted a second round of bidding but "the auction concluded without any further bidding or direct negotiation of the real estate." Hearing Exhibit C–6, R.R. 125a. Younkin contends that he merely "recessed" the auction but would permit further *negotiations* in private. If a true recess were declared, it was incumbent upon Younkin to advise the other bidders, including the then highest bidder, as to when and where further bids would be received to give them an opportunity to attend and/or continue bidding in an auction.

Instead, even though Younkin used the word "recessed," as well as "no sale" and auction "concluded," he did, in fact, announce that, henceforth, he and the owner were willing to negotiate privately with anyone else interested. From that point on, Younkin was not auctioning but was *brokering* the sale of that real estate and, unfortunately did not have the real estate license required by the Real Estate Licensing and Registration Act. The Legislature did not intend to have an auctioneer licensed to conduct competitive bidding go to a certain point with the bidders congregated and then continue on with one person privately in an unannounced time and place to perform the same function as a licensed real estate broker.

---

12. Younkin is not contesting the second clause of Finding 13 in which it is found that he told attendees that bidding was recessed, but that he and the family would be willing to discuss the property with anyone.

We conclude that the Commission did not err in determining that Younkin was not performing authorized duties at any *bona fide* auction when the sale of the real estate took place and therefore not exempted from the Real Estate Licensing and Registration Act licensure requirement. Accordingly, we affirm the Commission's Order.

### ORDER

AND NOW, this 7th day of May, 2001, the Order of the State Real Estate Commission, dated July 19, 2000, adopting the Proposed Adjudication and Order of Hearing Examiner Suzanne Rauer assessing a civil penalty against Scott A. Younkin under Sections 301 and 304 of the Real Estate Licensing and Registration Act, Act of February 19, 1980, P.L. 15, as amended, 63 P.S. §§ 455.301, .304 is hereby affirmed.